NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11496


COMMONWEALTH  vs.  DARKENS BONNETT.



Essex.        May 8, 2015. - September 24, 2015.

Present:  Gants, C.J., Cordy, Duffly, Lenk, & Hines, JJ.



Homicide.  Constitutional Law, Assistance of counsel.  Practice,
    Criminal, Assistance of counsel, Opening statement,
    Presence of defendant, Identification of defendant in
    courtroom, Failure to object, Argument by counsel, Argument
    by prosecutor, Disclosure of identity of informer,
    Disclosure of evidence in possession of Federal
    authorities, Capital case.  Evidence, Cross-examination,
    Identification, Videotape, Consciousness of guilt,
    Disclosure of evidence, Informer, Relevancy and
    materiality.  Witness, Cross-examination, Privilege.
    Identification.




    Indictment found and returned in the Superior Court
Department on September 15, 2010.

    The case was tried before Howard J. Whitehead, J., and a
motion for a new trial, filed on January 27, 2014, was heard by
him.



    Jeanne M. Kempthorne for the defendant.
    David F. O'Sullivan, Assistant District Attorney, for the
Commonwealth.

LENK, J.  The victim, Vincent Gaskins, was shot and killed in a parking lot across the street from a nightclub in Lynn. The shooting came on the heels of an argument between the victim and Brandon Payne, a friend of the defendant.  A Superior Court jury convicted the defendant of murder in the first degree on a theory of deliberate premeditation.  The trial judge subsequently denied the defendant's motion for a new trial.  On appeal from his conviction and from the denial of his motion for a new trial, the defendant claims that (a) his trial counsel rendered constitutionally ineffective assistance; and (b) on the eve of trial, the judge erred by denying the defendant's motion for disclosure of the identity of an informant who, according to a report prepared by the Federal Bureau of Investigation (FBI), had heard that Payne, not the defendant, had shot the victim. We reject the defendant's ineffective assistance of counsel claim, but remand for further proceedings in connection with his motion for disclosure of the informant's identity.  We do not now see cause to exercise our authority under G. L. c. 278, § 33E, to reduce the verdict of murder in the first degree or to order a new trial.

1.  Background.  The evidence at trial included the following.  Soon after 1 A.M. on a night in November, 2009, police found the victim lying on the ground in a parking lot across the street from a nightclub, with a gunshot wound in the

area of his right ear. The victim was taken to the hospital, where he died two days later.

A .22 caliber Beretta firearm was located at the crime scene. The firearm did not have a magazine in it. Without a magazine, it could have been loaded manually with one cartridge. A cartridge casing that had been discharged from the gun was found by the sidewalk of the parking lot. A spent projectile recovered from the victim's body was consistent with that of a .22 caliber projectile.

The events of the night of the shooting were described by Sheffery Johnson, the victim's cousin. Johnson testified that, on the day of the shooting, she picked up Payne in her truck. Johnson and Payne drove to a parking lot across the street from the nightclub. After they sat in the truck for some time, Johnson saw the victim leaving the nightclub. At about the same time, she saw a "dark skinned guy," wearing a gray sweat suit, dancing outside the nightclub. Johnson identified that man in court as the defendant. According to Johnson, Payne had introduced her to the defendant, to whom Payne referred as "his boy Black," "[a] couple days before" the shooting.

The victim and his girl friend walked over to Johnson's truck. Payne and the victim had been involved in "some tension" several months before. Payne got out of the truck and walked over to the victim. Then Payne, the victim, and the victim's

girl friend stood behind the truck and conversed.  Johnson, who noticed that the victim was "getting upset," walked over and joined the group.  Johnson heard Payne and the victim arguing.  The victim said, "See, that's why I don't want you fucking with my sister" -- apparently referring to Johnson -- because you got a smart-ass mouth."  Payne, for his part, asked the victim, "Why you keep throwing your hands in your pocket?"  Johnson "s[aw] a shadow pass [her]," but did not "focus[] on who it was."

Eventually, the victim suggested that he and Payne "go around the corner," "shoot the ones," and "dap up."  This meant, according to Johnson, that the two men would have a fistfight and, after one of them had won, would "shake hands, and that was going to be it."  Johnson demurred, announcing that "[t]here's no fighting [her] cousin," grabbing Payne, and swinging him around back toward the truck.

As soon as Johnson's back was turned, she heard a "pop" from the direction of where the victim had been standing.  When she turned around, Johnson saw the defendant standing over the victim's body, trying to tuck a gun into his pants,[1] and then running off.[2]

---

[1] In her grand jury testimony, with which she was impeached on cross-examination, Sheffery Johnson stated that she saw the defendant put "something" in his pants, and that she could not see that object.  A police officer testified that, in an interview some hours after the shooting, Johnson stated repeatedly that she had not seen a gun.

Although, in court, Johnson identified the defendant as the man who had been dancing outside the club and who was standing over the victim's body, defense counsel's cross-examination, as well as the testimony of a police officer called by the defense, indicated that earlier she had thought otherwise. In December, 2009, Johnson was shown a photographic array. She picked out an individual who was not the defendant as a person involved with the shooting. Johnson selected the defendant's photograph as "familiar to her," but said that she "did not think he was there that night." She also told a police officer that "she did not get a good look [at] the face of the person after the shooting."[3]

Johnson's trial testimony was corroborated, in part, by a confession reportedly made by the defendant to another witness, Joseph Burns. Burns was in Federal prison at the time of trial, and he acknowledged that he was cooperating with the authorities in the hope of earning a lighter sentence. According to Burns, he and the defendant had done "business" together: Burns had sold the defendant guns, and had bought "crack" cocaine from him. The guns were .25 and 9 millimeter and one .22 caliber. Burns stated that, several months after the shooting, in early

---

[2] Neither the victim's girl friend, who appeared before the grand jury, nor Brandon Payne was called to testify at trial.

[3] The officer testified that Johnson had not known the name of the shooter. He could not recall if she had known the shooter's nickname.

2010, he met the defendant in Lynn, to which the defendant recently had returned from New Jersey. The defendant told Burns that he and the victim "had words after the club," that the defendant "told [the victim] [to] take that around the corner," and that the defendant then "shot [the victim] in the face." The gun "didn't have a clip to it so there was only one round in it, in the chamber." On the day after that conversation, the defendant asked Burns to take him to the scene, to see if the firearm was still there. Police officers testified that the press were never informed that the gun found at the scene did not have a magazine in it, or that, in a confrontation involving the victim, words were exchanged about "going around the corner."[4]

Forensic evidence tied the defendant to the crime. Two latent prints were identified on the weapon found at the scene. One, a palm print on the back strap of the gun, was of sufficient quality and quantity to be analyzed. A police crime-scene analyst testified that, in his opinion, the palm print on

---

[4] In corroboration of Joseph Burns's testimony, the Commonwealth offered testimony from Thomas Arrington, the defendant's roommate at the time of the shooting. Arrington testified that he saw the defendant at various times with several guns, none of which was a .22 caliber. See note 16, infra. The roommate asked the defendant if he was involved in the shooting, and the defendant shrugged.

the gun was the defendant's.[5]  Biological matter detected on the gun contained a mixture of deoxyribonucleic acid (DNA) from at least two individuals.  The defendant's DNA matched the major male profile found in that mixture.  The probability that the DNA profile of a randomly selected African-American individual would match the major profile was one in 2.1 trillion.[6]  Payne was found to be a potential contributor to the mixture.  The probability that a randomly selected African-American individual would be a potential contributor to the mixture was one in eight.  The victim was excluded as a contributor to the mixture.[7]

---

[5] The analyst spoke of "individualizing" prints based on their "unique" characteristics, stating twice that "[n]o two individuals have ever been found to have the same unique sequence of" print characteristics.  The defendant does not contend that this testimony ran afoul of our admonition that "opinions expressing absolute certainty about, or the infallibility of, an 'individualization' of a print should be avoided."  See Commonwealth v. Gambora, 457 Mass. 715, 729 n.22 (2010).  Regardless of whether the analyst's testimony exceeded permissible bounds, a question we need not decide, it did not in any event give rise to a substantial likelihood of a miscarriage of justice.  The defendant did not deny that he had touched the gun, a fact supported also by the deoxyribonucleic acid (DNA) evidence.  See id. at 728-729.

[6] The record reveals that the defendant is African-American, and it suggests that Payne may be as well.

[7] The officer who had collected biological material from the gun and from the defendant testified at trial, as did the analyst who had generated the DNA profiles of the defendant, the victim, and Payne.  The analyst who had generated the DNA profile of the material taken from the gun, Kathleen Gould, was unavailable to testify.  Testimony was offered by a chemist who had reviewed Gould's work, Cailin Drugan.  As required, Drugan's testimony was devoted to Drugan's own analysis, not to the

Finally, five video recordings were presented at trial. Two were security video recordings filmed at establishments located near the crime scene. The recordings provided little information about the circumstances of the shooting, primarily because of the poor quality of one recording and the unhelpful vantage point of the other. The remaining recordings showed portions of police interviews with the defendant, with Johnson, and with Burns.[8] The interview with the defendant revealed that he had a distinctive tattoo that Payne had as well. The interview also showed the defendant denying, in the face of repeated accusations by police, that he had been at the club or the parking lot on the night of the shooting.

The jury were charged on the fourth day of testimony, and returned a guilty verdict on the same day. Represented by new counsel, the defendant filed a motion for a new trial, asserting that his trial counsel had provided constitutionally ineffective assistance. We remanded the motion to the Superior Court. After an evidentiary hearing, the motion was denied by the trial judge.

---

"facts or data underlying [Drugan's] opinion." See Commonwealth v. Tassone, 468 Mass. 391, 399 (2014), and cases cited.

[8] The recording of Burns's interview was played during his cross-examination but was not made an exhibit. The recording of Johnson's interview was not shown during trial, but it was marked as an exhibit, and the jury were informed that they could watch an excerpt of that exhibit upon request. The record suggests that no such request was made.

2.  <u>Ineffective assistance of counsel</u>.  The defendant points to an array of ways in which, in his view, the assistance provided by his trial counsel was ineffective.  The standard that governs ineffective assistance claims is two-pronged.  First, a defendant asserting such a claim must demonstrate "serious incompetency, inefficiency, or inattention of counsel -- behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer."  <u>Commonwealth</u> v. <u>Boria</u>, 460 Mass. 249, 252 (2011), quoting <u>Commonwealth</u> v. <u>Saferian</u>, 366 Mass. 89, 96 (1974).  We have emphasized that "[t]rial tactics which may appear questionable from the vantage point of hindsight, do not amount to ineffective assistance unless 'manifestly unreasonable' when undertaken."  <u>Commonwealth</u> v. <u>Johnson</u>, 435 Mass. 113, 133-134 (2001), quoting <u>Commonwealth</u> v. <u>Haley</u>, 413 Mass. 770, 777-778 (1992).  A tactic that was reasonable in the circumstances, given the information available at the time, will not support an ineffective assistance claim "[r]egardless whether counsel intended the strategy."  <u>Commonwealth</u> v. <u>Jenkins</u>, 458 Mass. 791, 806 (2011).

The second prong of the ineffective assistance of counsel standard is, ordinarily, that counsel's inadequate performance "likely deprived the defendant of an otherwise available, substantial ground of defence."  <u>Commonwealth</u> v. <u>Saferian</u>, <u>supra</u>

at 96. In an appeal from a conviction of murder in the first degree, we apply the test "more favorable to a defendant" of whether there is a substantial likelihood that a miscarriage of justice occurred. See Commonwealth v. Marrero, 459 Mass. 235, 244 (2011), citing Commonwealth v. Williams, 453 Mass. 203, 204-205 (2009). Under this test, we examine "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." Commonwealth v. Spray, 467 Mass. 456, 472 (2014), quoting Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).

The defendant's ineffective assistance claim was first presented on a motion for a new trial. We review the denial of such a motion for "a significant error of law or other abuse of discretion," Commonwealth v. Forte, 469 Mass. 469, 488 (2014), quoting Commonwealth v. Grace, 397 Mass. 303, 307 (1986), granting "special deference" to the rulings of a motion judge who, like the judge here, also presided at trial. See Commonwealth v. Forte, supra, quoting Commonwealth v. Grace, supra. Nevertheless, on appeal from a conviction of murder in the first degree, the defendant "has the benefit of our independent review, pursuant to G. L. c. 278, § 33E . . . of the

entire record." Commonwealth v. Carter, 423 Mass. 506, 513 (1996).

Against the backdrop of these principles, we examine the specific missteps that the defendant attributes to his counsel.

a. Concession that the defendant was at the scene. The defendant's first argument is that his attorney erred by conceding that the defendant was present at the scene of the crime. Counsel made this concession in passing in his opening statement, stating that, after the shot was fired, "Everyone leaves. They walk away . . . . Everyone, including Sheffery Johnson and Brandon [Payne] and [the defendant]."

This tactic was not manifestly unreasonable. "When the evidence implicating the defendant is strong, and a concession does not undercut viable defenses, a tactical concession . . . is securely within the realm of effective representation." Commonwealth v. Evelyn, 470 Mass. 765, 771 (2015), quoting Commonwealth v. Arriaga, 438 Mass. 556, 581-582 (2003). This kind of concession commonly is "part of a litigation strategy to boost [the defendant's] credibility with th[e] jury." Commonwealth v. Ramsey, 466 Mass. 489, 496 n.8 (2013). The evidence tying the defendant to the crime, including the fingerprint evidence, the DNA evidence, and the detailed confession that the defendant reportedly made to Burns, was strong. It was not unreasonable for his attorney to focus on

the argument that the defendant was not the shooter, and to enhance the credibility of that defense by conceding a fact that did not contradict it.

b. Johnson's testimony. Next, the defendant argues that his attorney erred in connection with two aspects of the testimony provided by Johnson.

First, on direct examination, Johnson was asked whether Payne (her date, and the defendant's friend) had gone anywhere after the shooting, to which she responded, "I just remember saying, 'Who the fuck was that that just shot my cousin?' And I was like, 'Your fucking boy just killed my cousin? Who the fuck was that?' And he said, 'Black. That was Black.'" Defense counsel did not move to have the out-of-court statements of Johnson and Payne stricken.[9]

We cannot say that counsel's failure to challenge Johnson's own out-of-court questions to Payne was manifestly unreasonable. Given that Johnson was the only percipient witness to testify, the prospects of a successful defense depended, to some degree, on undermining her identification of the defendant (which had occurred soon before the exchange about which the defendant complains). To this end, defense counsel's cross-examination of

---

[9] In closing argument, the prosecutor referred to Payne's out-of-court statement, saying, "Brandon [Payne] who told Sheffery [Johnson] he was the one who did it, he was the one who shot him, calls him Black."

Johnson, and his closing argument, stressed that Johnson had not seen the victim being shot.[10]  As the judge explained in his written decision on the defendant's motion, this line of defense stood to gain also from Johnson's testimony on direct examination that, immediately after the shooting, Johnson asked questions suggesting that she did not know who the shooter was.[11]

Payne's reported response, "That was Black," did not serve the defense's objectives in the same fashion.  But we agree with the judge that counsel's failure to request that this remark be stricken did not create a substantial likelihood of a miscarriage of justice.  For at least two reasons, Payne's reported words were unlikely to carry significant weight with the jury.  First, as the judge noted, Payne himself was present at the scene -- indeed, it was he, not the defendant, who had been quarreling with the victim.  Payne thus had a palpable incentive to shift attention away from himself.  In addition, given Johnson's fervent belief, by the time of the trial, that

---

[10] Counsel also reminded the jury, in his argument, that Johnson had failed to identify the defendant at a photographic array conducted shortly after the shooting.

[11] Although the judge stated otherwise, the record indicates that defense counsel did not provide an explanation for why he left Johnson's out-of-court statements unchallenged. Nevertheless, the reasonableness of counsel's course of action undermines the ineffective assistance claim regardless of whether counsel consciously articulated the reasons for his actions.  See Commonwealth v. Jenkins, 458 Mass. 791, 806 (2011).

the defendant was the shooter, her stated recollection of Payne's words was likely to be accorded limited credence.  We are persuaded that, in the context of the physical and testimonial evidence as a whole, Johnson's impassioned recounting of Payne's answer to her questions did not affect the result.

The second piece of Johnson's testimony with which the defendant takes issue occurred on cross-examination.  In the course of his questioning, defense counsel showed Johnson an excerpt from one of the security camera recordings.  While counsel was locating the relevant portion of the recording, Johnson exclaimed:

> "You can see him clearly come from the side of the building and blow my cousin's fucking brains out.  Are you stupid?  You clearly can see a hand come out and he blew my fucking cousin's brains out.  Period.  He did, him, Black, Barnett [sic], or whatever the hell his name is . . . . He killed my fucking cousin."

The judge told Johnson repeatedly to "[h]old on," instructing her to "wait until there's a question."  Defense counsel did not move to strike Johnson's outburst.

We discern neither ineffective representation nor prejudice to the defense.  Johnson was both the victim's cousin and herself the physically impaired survivor of a different shooting that occurred sometime before trial (a fact known to counsel, although not disclosed to the jury).  Defense counsel could

properly have expected that Johnson would be a volatile witness.
As the motion judge explained, counsel's questioning elicited
"loud and hyper emotional" testimony from Johnson that
"detracted from her credibility."  Although this testimony
included Johnson's exclamation that the video recording showed
the defendant to be the shooter, the jury could see otherwise
with their own eyes.[12]  See Commonwealth v. Womack, 457 Mass.
268, 275 (2010).  Consequently, Johnson's emotional and plainly
incorrect description of the recording provided a benefit to the
defense, by diminishing the degree to which her testimony could
be perceived as accurate and reliable.

c.  Johnson's in-court identification.  The defendant's
next contention is that his counsel should have moved in limine
to prevent Johnson from identifying the defendant in court as
the man she had seen dancing outside the nightclub and standing
over the victim's body.  As previously mentioned, when Johnson
was shown a photographic array soon after the shooting, she
selected an individual who was not the defendant as a person
involved with the shooting, and stated that she did not think
that the defendant's photograph depicted a man present at the
scene.

---

[12] We make this observation based on our own review of the
recording.  The judge, of course, saw the recording at trial.

In Commonwealth v. Collins, 470 Mass. 255, 262 (2014) (Collins), expanding on the holding in Commonwealth v. Crayton, 470 Mass. 228, 241-242 (2014) (Crayton), we announced that, in future cases, in-court identifications generally will not be permitted where a witness participated in a pretrial identification procedure that "produced something less than an unequivocal positive identification."  An attorney is "not ineffective for failing to make an objection that would have been futile under the prevailing case law," however.  Crayton, supra at 261, citing Commonwealth v. Conceicao, 388 Mass. 255, 264 (1983).  We therefore must evaluate defense counsel's failure to challenge Johnson's in-court identification testimony under the law as it was at the time of the trial.

Before Collins and Crayton, an in-court identification was excluded primarily if, "in the totality of the circumstances, it was 'tainted by an out-of-court confrontation . . . that [was] so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" Commonwealth v. Bastaldo, 472 Mass. 16, 31 (2015), quoting Crayton, 470 Mass. at 238 (omission and alteration in original). In all but unusual cases, an impermissibly suggestive out-of-court confrontation would render an in-court identification inadmissible only if the confrontation had been "arranged by the Commonwealth."  See Commonwealth v. Alcide, 472 Mass. 150, 165

(2015), quoting Commonwealth v. Bol Choeurn, 446 Mass. 510, 520 (2006). "An in-court identification was admissible in the absence of any prior out-of-court confrontation." Commonwealth v. Bastaldo, supra, citing Crayton, supra.

The defendant does not suggest that Johnson's identification was tainted by any suggestive out-of-court confrontation, whether orchestrated by the Commonwealth or otherwise. Contrast Commonwealth v. Alcide, supra at 153-154 (after failing to make unequivocal identifications of defendant in photographic arrays, two witnesses encountered defendant's photograph in newspaper articles; one witness also reported being shown photograph of defendant at district attorney's office). Accordingly, defense counsel's failure to challenge Johnson's identification testimony did not amount to ineffective assistance.

d. Videotaped police interview. As noted, the jury were shown a video recording of a police interview with the defendant. Portions of the recording were redacted. The defendant contends that his counsel was ineffective for failing to object to two aspects of the redacted recording.

First, the defendant points out that the recording included out-of-court statements made by the officers. The relevant portion of the interview was as follows:

Q.: "November 22, 2009, there was an incident at Soriano's.  You know what Soriano's is, right?"

A.: "It's like a club."

Q.: "I know you were there . . . out in the parking lot."

A.: "No."

Q.: "There's a video with you in it."

A.: "Yeah?"

Q.: "Right?  I know you were there."

A.: "I'm gonna see the video?"

Q.: "I can show you the video.  I don't have it with me now . . . . But I know you were there."

A.: "I wouldn't be able to vouch for that."

Q.: "People have told me you were there.  I got you on a video there.  A kid, [the victim], . . . was killed there . . . ."

A.: "You think I had something to do with that too?"

Q.: "No, man.  Were you there?  'Cause it doesn't look good if you tell me you weren't there and I can clearly see it on video, wearing a grey sweatsuit, right? You own a grey sweatsuit, right? . . ."

A.: "Nah . . . . That ain't got nothing to do with me, bro."

At the hearing on the defendant's motion for a new trial, his trial attorney explained that he chose to cooperate with the admission of the recorded interview as "effectively a way of [the defendant] getting up on the stand and being able to testify he wasn't there without him taking the stand."  This

line of reasoning does often support the strategic judgment that the introduction of out-of-court denials of guilt will benefit the defense.  See Commonwealth v. Barbosa, 457 Mass. 773, 799 (2010), cert. denied, 131 S. Ct. 2441 (2011); id. at 799-800 quoting Commonwealth v. Diaz, 453 Mass. 266, 274 (2009), overruled on another ground by Commonwealth v. Womack, supra; Commonwealth v. Merola, 405 Mass. 529, 548 (1989).  Here, however, the defendant was shown on the recording denying that he had been at the club on the night of the shooting -- a position that defense counsel had conceded in his opening was not the case.  The recorded interview consequently was likely to harm the defense, by suggesting that the defendant had been untruthful upon his arrest.

For related reasons, however, the recording would have been admissible over objection, if one had been made.  It is true that "if a defendant is charged with a crime and unequivocally denies it, that denial is not admissible in evidence." Commonwealth v. Morse, 468 Mass. 360, 375 n.20 (2014), quoting Commonwealth v. Diaz, supra.[13]  The defendant's denials here,

---

[13] "The rationale for the rule is that '[e]xtrajudicial accusatory statements made in the presence of a defendant, which he has unequivocally denied, are [inadmissible] hearsay.'" Commonwealth v. Morse, 468 Mass. 360, 375 n.20 (2014), quoting Commonwealth v. Womack, 457 Mass. 268, 272 (2010).  Such accusatory statements shed their hearsay character when they are offered not for the truth of the matters asserted, but to provide context for admissible statements of the defendant.  See

however, were not of the requisite unequivocal character that would render them inadmissible. In particular, when told by police that a video recording showed him at the club, the defendant first asked "Yeah?" and then wondered aloud whether he would be permitted to see that video recording. And although he had initially responded in the negative when told that police knew he had been in the parking lot where the victim was shot, the defendant subsequently said only that he "wouldn't be able to vouch for that." These were "equivocal response[s] that could be construed as self-incriminating and therefore admissible," Commonwealth v. Lewis, 465 Mass. 119, 127 (2013); the true meaning of these responses "was for counsel to argue and the jury to determine." Id. Furthermore, to the extent

---

Commonwealth v. Pytou Heang, 458 Mass. 827, 855 (2011); United States v. Walter, 434 F.3d 30, 33-35 (1st Cir.), cert. denied, 547 U.S. 1999 (2006). Although the defendant does not so argue, it may have been appropriate for his attorney to request an instruction limiting the jury's consideration of the officers' recorded statements to this nonhearsay purpose. See Commonwealth v. Carrion, 407 Mass. 263, 275 (1990); Mass. G. Evid. § 105 (2015). Even assuming that such an instruction should have been requested and given, we discern no substantial likelihood of a miscarriage of justice. The officers' statements played an insubstantial role in the evidentiary picture presented at trial. In particular, the jury would have seen for themselves that the defendant was not, as the officers stated, identifiable on a video recording of the crime scene. See Commonwealth v. Womack, supra at 275. There was no suggestion at trial that the officers' mention of "people" who reported seeing the defendant at the scene referred to individuals other than the trial witnesses. And the statement that "it doesn't look good" if the defendant were to say falsely that he was not at the scene was a commonsense observation, not a fact otherwise unknown to the jury.

that the defendant denied being at the nightclub on the night of the shooting, the evidence suggested, as defense counsel conceded, that that denial was a "false statement," admissible "to show consciousness of guilt." See Commonwealth v. Lavalley, 410 Mass. 641, 649 (1991). In sum, defense counsel's failure to challenge the admission of the recording made no difference.

The defendant's second complaint about the recorded interview is that the recording showed him wearing handcuffs. Defense counsel did not overlook that issue at trial. Before the Commonwealth introduced the video, counsel informed the judge that his "[n]umber one concern" was that "the video has [the defendant] being interviewed while he has handcuffs on his hands." Counsel argued that "[it] would be prejudicial for the jury to see that." The judge disagreed, reasoning essentially that the probative value of the recording was not "substantially outweighed by the danger of unfair prejudice or the risk of misleading the jury." See Commonwealth v. Scott, 470 Mass. 320, 330 (2014), quoting Commonwealth v. Pytou Heang, 458 Mass. 827, 851-852 (2011).

Although defense counsel arguably failed to preserve an objection to that ruling, this omission worked no harm on the defense. "The weighing of the prejudicial effect and probative value of evidence is within the sound discretion of the trial judge, the exercise of which we will not overturn unless we find

palpable error." Commonwealth v. Bonds, 445 Mass. 821, 831 (2006). No such palpable error occurred here. As the judge noted, the admission of a recording showing the defendant to have been handcuffed at the police station, soon after being arrested, does not signal to the jury that the judge has determined the defendant to be dangerous.[14] Such a recording is thus less prejudicial than an order that the defendant be handcuffed in the court room. On the other side of the scale, the recorded interview of the defendant was probative both of the defendant's ties to Payne and of a consciousness of guilt. A preserved objection to the recording thus would have been fruitless.

e. Gun and drug sales. The defendant argues that his attorney should have objected to Burns's testimony that Burns had sold the defendant guns, and that the defendant had sold Burns drugs. At least one question posed by defense counsel also referred to these transactions. Again, we discern neither

---

[14] The judge did not address a related issue posed by the recording, namely, that portions of it revealed, at least to an attentive viewer, that the defendant had been arrested and handcuffed in connection with a different, subsequent investigation. It is possible that this issue could have been averted if defense counsel had requested additional redactions to the recording. In any event, we are confident that presentation of this issue would not have altered the judge's highly discretionary decision to admit the recording, and that any inference by the jury that the defendant may have been involved in a later, undescribed incident would not have influenced their decision.

ineffective assistance nor the requisite prejudice to the defense.

Defense counsel explained, in connection with the defendant's motion for a new trial, that his goal in coping with Burns's testimony was to suggest that it was not plausible that the defendant would have confessed to Burns. In order to achieve this aim, counsel sought to stress that "[t]heir business relationship was just that, a business relationship." This theme was pursued in counsel's cross-examination, which revealed that Burns and the defendant "never really hung around" and that "[e]very time [Burns] met with [the defendant] was either to sell a gun or to buy drugs." In closing, counsel disparaged Burns's assertion that "someone who . . . knows him only for business, has confessed to him about shooting someone." This tactic was not unreasonable. And although it is possible that counsel could have pursued the same approach while more artfully skirting the precise nature of the defendant's role in his business dealings with Burns, we cannot say that counsel's performance fell "measurably below" what would be expected of an "ordinary fallible lawyer." Commonwealth v. Boria, 460 Mass. 249, 252 (2011), quoting Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).

Nor did counsel's performance on this score create a substantial likelihood of a miscarriage of justice. In his

decision on the defendant's motion for a new trial, the judge indicated that he would have denied a motion to exclude the evidence that Burns had sold guns to the defendant, if one had been made. Such a decision would not have been reversible error. Evidence showing a defendant's access to firearms may be "admissible for purposes other than showing a defendant's bad character or criminal propensity," Commonwealth v. McGee, 467 Mass. 141, 157 (2014) (McGee), if the probative value of that evidence "outweigh[s] the likelihood that [it] will have an impact on the jury unfair to a defendant." Id., quoting Commonwealth v. Toro, 395 Mass. 354, 358 (1985). Our recent decisions have indicated that this standard typically will not be satisfied by evidence showing only "a person's general acquaintance with weapons," McGee, supra, quoting Commonwealth v. Toro, supra, particularly where the weapons in question "definitively could not have been used in the commission of the crime." McGee, supra, quoting Commonwealth v. Barbosa, 463 Mass. 116, 122 (2012). Here, while the Commonwealth did not suggest that the victim was shot with a gun sold by Burns,[15] there also was no "forensic evidence establish[ing] that the weapon[s] could not have been used to commit the crime." See

---

[15] Burns testified that he regularly obliterated the serial numbers from firearms before selling them. The gun recovered at the scene of the shooting had an identifiable serial number on it.

McGee, supra at 157-158, citing Commonwealth v. Barbosa, 463 Mass. at 123. And the evidence in question was not only probative of the defendant's access to firearms; it also represented significant information for the jury to consider in assessing Burns's credibility.[16] In addition, the judge provided an appropriate limiting instruction, stating that the jury could consider "testimony concerning certain involvement that [the defendant] may have had in the trafficking of guns" only as to "whether [the defendant] had access to a firearm at or around the time of the killing" and "as to the relationship between Mr. [Burns] and [the defendant]." See McGee, supra at 158, and cases cited. Finally, the evidence that the defendant had purchased guns "received only 'scant attention' at trial." Id., quoting Commonwealth v. Barbosa, supra at 124.[17] Counsel's failure to object was, again, without consequence.

---

[16] Similarly, the testimony of Arrington, the defendant's roommate, that he had seen the defendant with guns, but not with a .22 caliber, see note 4, supra, was probative of Burns's credibility, because it tended to confirm Burns's testimony that he had sold the defendant a variety of guns. Other factors noted in our discussion of Burns's testimony also would have countered any claim (which the defendant does not make) that the admission of Arrington's testimony was reversible error, and, by extension, any claim (also not made) that defense counsel's failure to object to that testimony amounted to ineffective assistance.

[17] The evidence that the defendant had sold drugs to Burns received even less attention at trial, and was unlikely to sway the jury's view of whether the defendant was guilty of murder.

f.  Closing arguments.  The defendant's last pair of complaints about his attorney's performance concerns the closing arguments.  One of these criticisms concerns defense counsel's own argument; the other, counsel's failure to challenge a portion of the prosecutor's argument.

Defense counsel's closing was devoted to the argument that the Commonwealth had failed to prove that the defendant was the shooter.  According to the defendant, his attorney was remiss in failing to argue also that the shooter did not premeditate the killing.  The judge understood this argument to suggest that counsel should have taken the inconsistent position, "I didn't do it, but if I did, it wasn't murder in the first degree."  We do not think that the argument is so lightly dismissed.  It would have been consistent, and conceivably beneficial, for counsel to have argued that the defendant was not proved to be the shooter, and that the shooter -- whoever he was -- was not proved to have acted with premeditation.  Even so, we cannot say that the approach taken by counsel was manifestly unreasonable.  As indicated earlier, a tactical decision to focus on the most important or promising lines of defense, while relinquishing others, can serve to enhance the credibility of a defense, in part by warding off the impression that a defendant is grasping at straws.  See Commonwealth v. Ramsey, 466 Mass. 489, 496 n.8

(2013).[18]  The fact that the tactic chosen "may appear questionable from the vantage point of hindsight" does not suffice to support an ineffective assistance claim.  See Commonwealth v. Johnson, 435 Mass. 113, 133-134 (2001), quoting Commonwealth v. Haley, 413 Mass. 770, 777-778 (1992).

Lastly, the defendant contends that his attorney should have objected to the prosecutor's statement, in closing, that the defendant "waited in the shadows like a coward" before shooting the victim.  Any error on this score does not warrant reversal.  Johnson testified that, while Payne and the victim were arguing, she "s[aw] a shadow pass [her], but, . . . never focused on who it was."  In the security camera footage, the entire scene appears to be bathed in shadows, whether due to the late-night hour, the poor quality of the recordings, or both.  At worst, the prosecutor's remark was a minor embellishment, see Commonwealth v. Roy, 464 Mass. 818, 834 (2013), citing Commonwealth v. Sanna, 424 Mass. 92, 107 (1997), and counsel's failure to object to that remark did not give rise to a substantial likelihood of a miscarriage of justice.

g.  Cumulative effect.  Considered both separately and cumulatively, the missteps that the defendant attributes to his counsel do not rise to the level of a violation of rights

---

[18] Otherwise put, a reasonably effective attorney could have been concerned that the jury might overlook the subtlety of the claim, "I didn't do it, and whoever did it did not premeditate."

requiring a new trial. The assistance provided to the defendant by his attorney was sufficiently effective to render the trial fair, even if not perfect, and that is all that can be asked. See Commonwealth v. Brescia, 471 Mass. 381, 391 (2015), quoting Commonwealth v. Graves, 363 Mass. 863, 872-873 (1973) ("[a] defendant is entitled to a fair trial but not a perfect one, 'for there are no perfect trials'"); Commonwealth v. Mahar, 442 Mass. 11, 20-21 (2004) (Sosman, J., concurring), quoting Strickland v. Washington, 466 U.S. 668, 689 (1984) ("the purpose of the effective assistance guarantee of the Sixth Amendment [to the United States Constitution] is . . . to ensure that criminal defendants receive a fair trial").

3. Unidentified informant. The defendant's other claim of error concerns rulings made by the judge with regard to the disclosure of the identity of a purportedly confidential informant. One week before trial, defense counsel received from the Commonwealth a report prepared by the FBI, apparently produced as a document containing "facts of an exculpatory nature" pursuant to Mass. R. Crim. P. 14 (a) (1) (A) (iii), as amended, 442 Mass. 1518 (2004). The report recounted a meeting between an informant and three law enforcement agents: an FBI special agent, and two officers of the Lynn police department, who also served as "task force officers." The report described the informant as "[a]n individual, who is in a position to

testify." According to the report, the informant "heard from someone that the word on the streets of Lynn" was that "PAYNE shot and killed [the victim]. Immediately after the shooting, PAYNE provided the pistol to [the defendant], aka BLACK, and ordered him to get rid of the weapon." The report added that the informant knew that the defendant had "moved from New Jersey to Lynn, MA, shortly before [the victim's] murder."

Upon receiving this report, defense counsel moved for an order requiring the Commonwealth to provide him with the name and address of the informant. A judge of the Superior Court, who was not the trial judge, ordered the Commonwealth to "inquire of [the Lynn police officers] as to the identity of 'an individual, who is in a position to testify.'" On the first day of jury selection, defense counsel told the trial judge that the prosecutor had responded that "the Lynn officers were not authorized to disclose any of that information to counsel." Counsel requested that the Commonwealth "still be ordered to provide . . . that information." He explained that, "if [he] knew the name of that someone, [he] would send an investigator out to speak to that person to see if there's any relevant evidence."

At the judge's request, the prosecutor telephoned an assistant United States attorney (AUSA) involved with the FBI's dealings with the informant. After that conversation, the

prosecutor told the judge that, according to the AUSA, the informant was considered to be "a confidential source," who "may be in a position to testify at some point down the road." The prosecutor reported that the Lynn police officers were "not authorized to disclose" information about the informant's identity, which those officers had acquired "in their capacity as members of the [F]ederal task force." He said also that the AUSA had "explain[ed] . . . [that] in the [F]ederal rules, they don't have to disclose [whether a witness will testify] until [twenty-one] days before trial . . . . And [the AUSA] wouldn't get into any of that with me and I didn't ask."

The judge then denied the defendant's motion for disclosure of the informant's identity. The judge also declined to permit defense counsel to pose questions about the informant's identity to the Lynn police officers. The defendant preserved his objections to these rulings.

The judge gave two reasons for his rulings. The first concerned the fact that the informant's identity was held by the FBI, not by State prosecutors or police. The second reason was, in essence, that the defendant had no right to learn of the informant's identity, irrespective of which body held that information. Taking up these reasons in order, we conclude that neither suffices to support the judge's rulings.

a.  Dual sovereignty.  The judge's first stated reason was that the "[F]ederal government is a separate sovereign," which "has refused to comply."  The judge reasoned that "the way we have to look at it is it's as though the United States was Bolivia.  And Bolivia has refused to give us the information."  For purposes of our discussion, we adopt the far-from-certain premise that the information reported by the prosecutor sufficed to establish that the Commonwealth possessed no knowledge of the informant's identity.[19]  Even so, we do not share the analysis offered by the judge.

We have recognized for many years that the interface between State and Federal sovereigns in criminal investigations and prosecutions "creates a potentiality for unfairness which would need correction if realized in practice."  Commonwealth v. Liebman, 379 Mass. 671, 674 (1980) (Liebman I), S.C., 388 Mass. 483 (1983) (Liebman II).  In order to allay this concern, we have held that "in dual sovereignty situations . . . 'the burden of securing Federal cooperation should be placed on the State prosecutor rather than on the defendant.'"  Commonwealth v. Lykus, 451 Mass. 310, 327 (2008), quoting Liebman I, supra at

---

[19] Notwithstanding the limited, second-hand information relayed by the prosecutor, it remains unclear whether the investigation that gave rise to the Federal Bureau of Investigation report was conducted jointly with the Commonwealth, and what role, precisely, the Lynn police officers played in that investigation.

675.  See Matter of Pressman, 421 Mass. 514, 518 (1995);

Commonwealth v. Donahue, 396 Mass. 590, 598-600 (1986).  In an

instructive case, the defendant moved unsuccessfully to obtain

Federal grand jury minutes, to which he would have been entitled

had the grand jury been convened by the State (or, it appeared,

had the trial been conducted in Federal court).  Liebman I,

supra at 674-675.  We remanded with instructions that the

district attorney be required "to take whatever steps are

appropriate to secure the minutes in question."  Id. at 675.

"If the Federal court . . . refuses to send to the State court

the requested transcripts," we said, the State indictment would

be dismissed.  Id.  See Commonwealth v. Lykus, supra;

Commonwealth v. Donahue, supra at 598-599; Liebman II, supra at

486-487.

The same analysis applies here.  Assuming that the

defendant is entitled to the information that he seeks, that

entitlement must not be foiled by "[t]he introduction of two

sovereignties," each able to withhold information by asserting

its independent sovereignty.  See Liebman I, 379 Mass. at 674.

"[C]ooperation between State and Federal prosecutors is and

should be common enough" that the equitable course, here, too,

is to require that the Commonwealth bear the onus of securing

Federal cooperation.  See Commonwealth v. Donahue, 396 Mass. at

600, quoting Liebman I, supra at 675.[20]

b.  Informant privilege.  The second reason the judge gave

for his rulings was that the information relayed in the FBI

report "is so remote that it does not warrant penetrating what

appears to be a claim of informant privilege."  This line of

reasoning, while relevant to an appropriate examination of the

defendant's motion for disclosure of the informant's identity,

should not have been the beginning and end of that examination.

"The government's privilege not to disclose the identity of

an informant has long been recognized in this Commonwealth."

Commonwealth v. Dias, 451 Mass. 463, 468 (2008) (Dias), and

cases cited.  This "informant privilege" may be asserted where

the Commonwealth otherwise would be required to provide an

informant's identity to a defendant as part of its discovery

obligations.[21]  Roviaro v. United States, 353 U.S. 53, 59 (1957)

---

[20] A different analysis applies where a defendant asserts
after trial that, although no judicial error occurred, the
prosecutor "suppress[ed] . . . evidence favorable to an accused"
concerning a confidential informant.  See Commonwealth v. Daye,
411 Mass. 719, 728 (1992), quoting Brady v. Maryland, 373 U.S.
83, 87 (1963).  A determination that the undisclosed information
was held only by the Federal government may defeat this type of
claim, because "[t]he prosecutor cannot be said to suppress that
which is not in his [or her] possession or subject to his [or
her] control."  Commonwealth v. Donahue, 396 Mass. 590, 596
(1986).

[21] There is apparently no disagreement that, absent the
assertion of the informant privilege, the identity of the person

(Roviaro). The justification for permitting the Commonwealth to maintain an informant's anonymity is the need to encourage "citizens to communicate their knowledge of the commission of crimes to law-enforcement officials." Id.

The analysis of whether an informant's identity should be kept confidential or disclosed may best be described as generally occurring in two stages. The first stage involves preliminary determinations as to (a) whether the Commonwealth has properly asserted an informant privilege, and (b) whether the defendant has adequately challenged the assertion of the privilege as an impermissible interference with his or her right to present a defense. The second stage of the analysis then involves a balancing test, introduced by the United States Supreme Court in Roviaro, supra, in which the interest of the public in protecting the anonymity of informants is weighed against the defendant's right to defend himself.

The preliminary stage calls for the two following inquiries. First, "[t]he scope of the [informant] privilege is limited by its underlying purpose." Id. at 60. Accordingly, the privilege may be asserted only where disclosure would endanger the informant or otherwise impede law enforcement efforts. See id.; Puerto Rico v. United States, 490 F.3d 50, 62

who provided the information detailed in the report produced to the defendant would be discoverable under Mass. R. Crim. P. 14 (a) (1) (A) (iii), as amended, 442 Mass. 1518 (2004).

(1st Cir. 2007), cert. denied, 552 U.S. 1295 (2008).

Ordinarily, the facts indicating whether or not the privilege

would serve its underlying purpose are within the Commonwealth's

control.

Second, if the Commonwealth properly has asserted an

informant privilege, the defendant may request that the

privilege be set aside on the grounds that it "interferes with a

fair defence." Commonwealth v. Johnson, 365 Mass. 534, 544

(1974), S.C., 372 Mass. 185 (1977) (Johnson). A defendant

making such a claim is required to present "some offering so

that the trial judge may assess the materiality and relevancy of

the disclosure to the defense, if that relevancy is not apparent

from the nature of the case and the defense offered thereto."

Commonwealth v. Kelsey, 464 Mass. 315, 323 (2013) (Kelsey),

quoting Commonwealth v. Swenson, 368 Mass. 268, 276 (1975).[22]

The relatively undemanding nature of this standard is the result

of the fact that, again, the details concerning privileged

information sought by the defendant ordinarily are not in his or

---

[22] We have said that this requirement of materiality asks "whether disclosure [is] needed . . . for a fair presentation of [the defendant's] case." Commonwealth v. Kelsey, 464 Mass. 315, 323 (2013) (Kelsey). See Commonwealth v. Dias, 451 Mass. 463, 469 (2008) (Dias), quoting Commonwealth v. Lugo, 406 Mass. 565, 571 (1990), and Commonwealth v. Ennis, 1 Mass. App. Ct. 499, 501-502 (1973) ("standard of materiality or something roughly akin thereto" has been described variably with terms "'helpful,' 'material,' 'relevant,' [and] 'important'").

her possession.  See Commonwealth v. Hernandez, 421 Mass. 272,
276 (1995), quoting Johnson, supra at 547.

The second stage of the analysis is undertaken if the
privilege both has been asserted properly by the Commonwealth
and has been challenged adequately by the defendant.  Then the
judge must decide whether the informant's identity and
concomitant information are sufficiently "relevant and helpful
to the defense of an accused" that it must be disclosed.  See
Dias, 451 Mass. at 468, quoting Roviaro, supra at 60-61.  This
determination requires the judge to engage in Roviaro's
"balancing [of] the public interest in protecting the flow of
information against the individual's right to prepare his [or
her] defense," taking into account "the crime charged, the
possible defenses, the possible significance of the [privileged]
testimony, and other relevant factors."  Dias, supra at 468-469,
quoting Roviaro, supra at 62.

The judge's denial of the defendant's motion for disclosure
of the informant's identity here was not grounded in an informed
application of this framework.  Beginning with the element of
the preliminary inquiry concerned with the Commonwealth's
assertion of the informant privilege, a meager basis at best was
presented to believe that the privilege was appropriately being
invoked.  All of the information concerning the informant was
conveyed to the judge second-hand, by a State prosecutor with no

personal knowledge of the circumstances. The prosecutor could say only, in essence, that the Federal government did not wish to reveal the informant's identity at that time -- and that the AUSA involved "wouldn't get into any of that . . . and I didn't ask." No details were provided with regard to whether the authorities were treating the individual interviewed by the FBI as a confidential informant who must remain anonymous. And no facts presented indicated that disclosure of the informant's identity would imperil the informant or injure other law-enforcement interests.[23] While it is possible that the importance of concealing an informant's identity is, in some instances, self-evident, we do not think that it was here, particularly in view of the statement in the FBI report that the informant was "in a position to testify." This enigmatic statement at least called for further inquiry.

The other element of the preliminary analysis, namely, the adequacy of the defendant's contention that the informant privilege should give way to his right to present a defense, may have been the focus of the judge's remark that the information contained in the FBI report was "remote." For at least two reasons, however, the remoteness of that information did not

---

[23] Among the matters that remained unexplored when the judge made his rulings was the nature of the investigation in which the informant was involved, see note 19, supra, including whether that investigation was connected in any way to the crime for which the defendant was being tried.

itself establish that the informant's identity was not material and relevant to the defense.  With regard to relevancy, the defendant posited at trial that the victim had been shot by another man; the informant's report that Payne was the shooter was thus intensely relevant to the theory of the defense.  Contrast Kelsey, supra at 326 (identity of percipient witness not obviously relevant to defense where defendant did not apparently intend to pursue defense of misidentification).

As for the materiality of the informant's identity, it is true that, according to the FBI report, the information relayed by the informant concerned the "word on the streets of Lynn"; standing alone, "'word on the street' carries no indicia of reliability."  Commonwealth v. Silva-Santiago, 453 Mass. 782, 804 (2009).  Still, the informant apparently was able to provide details that went beyond a threadbare rumor, such as the fact that both Payne and the defendant had handled the murder weapon (which was compatible with the DNA evidence) and the fact that the defendant had traveled to New Jersey (which dovetailed with Burns's trial testimony).  See id. at 804-805 (reliability of "word on the street" may be bolstered by showing "that the 'word' came from a percipient witness" or by other facts rendering that "word" inherently plausible).  At a minimum, the question whether the informant was a percipient witness to the

shooting, or whether he had spoken to a percipient witness, should have been explored.

Moreover, in some circumstances, knowledge of the informant's identity can offer substantial aid to the defense even if the informant himself cannot provide testimony sufficiently relevant and reliable to be admitted at trial. See Dias, supra at 473 ("While calling the informant as a witness might be one way of putting that information to good use in this case, it is not the only way, and it may not be as useful to the defense as knowledge of his [or her] identity before trial"); Roviaro, supra at 64 ("The desirability of . . . interviewing [a confidential informant] in preparation for trial . . . was a matter for the accused rather than the Government to decide"); United States v. Saa, 859 F.2d 1067, 1074 (2d Cir. 1988), cert. denied, 489 U.S. 1089 (1989) and cases cited ("the right under Roviaro to information about an informant [is] not merely so that the defense can call the informant to testify, but so that it can seek to interview him first"). Here, there was no apparent reason to doubt that, by employing an investigator or other means, the defendant might have explored whether the informant knew other pertinent information, whether the person who had told the informant about the "word on the streets of Lynn" could be identified, and whether that person could elaborate on the sources and substance of his or her

information.  The Commonwealth was of course free to endeavor to persuade the judge that disclosure of the informant's identity would yield little of value to the defense.[24]  If the judge were persuaded, upon a proper showing, that the informant's identity would be unlikely to lead the defendant to more than second- or third-hand "word on the street," the conclusion that the defendant had made an inadequate showing of materiality might have been warranted.  But no such showing was undertaken.

We need not speculate about what the results of a second-stage Roviaro balancing exercise might have been, had the judge properly determined that the Commonwealth appropriately asserted the informant privilege and that the defendant made an adequate offering concerning the materiality and relevancy of the informant's identity to the defense.[25]  The point is that "[t]here was no attempt by the judge at orderly appraisal of the actuality of any threat and the materiality of the [information]

---

[24] "In a case where it is not clear from the record that disclosure of an informant's identity would provide something material to the defense, a judge may hold an in camera hearing to assist in making that determination."  Dias, supra at 472. "The nature of the in camera hearing is left to the discretion of the judge, who may, in light of the particular facts, determine whether the presence of counsel is necessary or appropriate."  Id. at 472 n.15, citing Commonwealth v. Lugo, 23 Mass. App. Ct. 494, 504 (1987), S.C., 406 Mass. 565 (1990).  See generally Commonwealth v. Shaughessy, 455 Mass. 346, 354 (2009), and cases cited.

[25] Any second-stage balancing in which the judge may have engaged implicitly was premature and, consequently, misplaced.

sought. Nor was any compromise considered that might allow disclosure while minimizing danger to the [informant]." Johnson, 365 Mass. at 546. See Kelsey, 464 Mass. at 327-328. We remand for further proceedings to conduct the requisite "orderly appraisal" of the relevant factors in accordance with the framework we have described.

We envision that those proceedings will include the following. Upon remand, a hearing should be held to reconsider the defendant's pretrial motion for disclosure of the informant's identity. If the judge determines that the motion was meritorious,[26] the defendant should be afforded a reasonable interval to try to interview the informant and to investigate pertinent information, if any, that the informant may provide. If the defendant then successfully presents evidence that "might create a reasonable doubt that did not otherwise exist, a new trial may be appropriate. If . . . not, the verdict and judgment may be permitted to stand." Liebman I, 379 Mass. at 676.[27] Because the defendant preserved the issue prior to the

---

[26] If the pretrial motion was not meritorious, but new circumstances permit the informant's identity to be disclosed (whether now or in the future), the defendant may seek a new trial upon a showing that newly discovered evidence "would probably have been a real factor in the jury's deliberations." Commonwealth v. Cowels, 470 Mass. 607, 617 (2015), quoting Commonwealth v. Grace, 397 Mass. 303, 305-306 (1986).

[27] In Commonwealth v. Liebman, 388 Mass. 483, 487 n.4 (1983), we noted that the standard of review delineated in

current appeal, the reconsidered decision on the merits of his pretrial motion -- and, if that motion is allowed, the decision as to whether information uncovered as a result warrants a new trial -- will be appealable as decisions on a postconviction motion filed before direct appeal.  See Liebman II, supra; Liebman I, supra.

4.  Conclusion.  We reject the defendant's claim that he was denied the right to effective assistance of trial counsel. We remand the matter to the Superior Court for further proceedings consistent with this opinion concerning the defendant's motion for disclosure of the informant's identity. On our review of the entire record now before us, pursuant to G. L. c. 278, § 33E, we do not discern cause to reduce the verdict of murder in the first degree or to order a new trial.

So ordered.

---

Commonwealth v. Liebman, 379 Mass. 671, 676 (1980), is "less exacting . . . than the constitutional requirements of [Federal decisions]."  More recently, we clarified that an asserted right to disclosure of an informant's identity is a constitutional claim that, when preserved, is reviewed "to determine whether the error, if any, was 'harmless beyond a reasonable doubt.'" Kelsey, supra at 319, quoting Commonwealth v. Bacigalupo, 455 Mass. 485, 495 (2009).