HOIME, COMMONWEALTH vs., 100 Mass. App. Ct. 266

 
 COMMONWEALTH vs. CHRISTOPER F. HOIME.

100 Mass. App. Ct. 266
 December 3, 2020 - September 23, 2021

Court Below: Superior Court, Hampshire County
Present: Green, C.J., Sullivan, & Shin, JJ.

 

Rape. Evidence, Qualification of expert witness, Relevancy and materiality, First complaint, Medical record. Witness, Expert. Practice, Criminal, Argument by prosecutor.

At the trial of an indictment charging rape, the Superior Court judge did not err or abuse his discretion in admitting the testimony of a toxicologist regarding the symptoms of gamma hydroxybutyric acid (GHB) ingestion, where the judge determined that the testimony fell within the scope of the toxicologist's expertise as a forensic scientist and had a reasonable basis to conclude that the toxicologist had adequate skill based on her education, training, and experience in forensic science to testify as an expert in the field of toxicology [271-272]; and where the testimony was relevant to consent even if the source of the drug was unclear (i.e., the Commonwealth was not required to show that the defendant administered GHB to the victim given that the defendant was not charged with rape by drugging) and relevant to show that a negative test result did not rule out GHB ingestion (i.e., the jury were permitted to infer that someone put GHB in the victim's drink based on her description of her symptoms and the expert testimony regarding the effect of GHB and that she was tested too late to detect it), and was not unduly prejudicial to the defendant [272-274].

At a rape trial, there was no error in the admission of medical records completed by a sexual assault nurse examiner and her corresponding testimony without redacting certain statements, where those records and accompanying testimony were statements made for the purpose of obtaining medical treatment [274-275]; further, no substantial risk of a miscarriage of justice arose from the erroneous admission of the name of a hotel and a room number, where, although that evidence was not relevant to medical treatment and should have been redacted, it was cumulative of testimony offered by the hotel manager and the defendant did not dispute that he and the victim had spent the night in room 157 at the hotel, and thus it did not materially influence the verdict [275]; finally, the victim's initial decision not to report the assault and her subsequent decision to go forward were necessary to explain the chain of custody of the evidence and the delay in testing, and the Commonwealth, moreover, was permitted to anticipate the defense of fabrication and to introduce that evidence on direct rather than redirect examination [275-276].

At a rape trial, given the nature of the defense that the victim fabricated her allegation, no substantial risk of a miscarriage of justice arose from the 

 Page 267 

erroneous admission of a police officer's testimony about the victim's statements in violation of the first complaint doctrine (i.e., the victim's report of a past sexual assault) that unfairly enhanced the victim's credibility, where it could be said that the improper evidence had but very slight effect; moreover, there was no error in the admission of evidence that the victim withdrew and reinstated her complaint (and what the officer did with the evidence when the victim did so), which was independently admissible on the issue of chain of custody and laid a foundation for the admission of physical evidence, nor was there error in the victim's explanation that continuing the investigation was too emotional for her, which was relevant to the anticipated defense of fabrication, nor was there error in the officer's testimony that he cross-referenced a record of the registry of motor vehicles and the hotel room registration, which was testimony that simply described how different exhibits were obtained, and finally, there was no error in the officer's testimony regarding the recovery and return of a broken mirror, which was independently admissible to explain its absence at trial. [276-277]

At a rape trial, no substantial risk of a miscarriage of justice arose from the playing of an audio recording of a police interview with the defendant that contained a repetition of a rape allegation, where the recording was not offered as first complaint testimony, but rather to provide context for the defendant's admissions. [277-279]

At a rape trial, no substantial risk of a miscarriage of justice arose from the prosecutor's statements in closing argument that the defendant's testimony was inconsistent, that the defendant's version of events did not make sense, that (given that the defendant had lied previously to police) he was lying at trial, and that in contrast the victim's testimony was credible, consistent, and corroborated, where, given that the defense was fabrication, the prosecutor's comments in response to that theory were fair, and in any event, even if there had been error in the closing argument, there was no substantial risk of a miscarriage of justice based on the strength of the physical evidence. [279-280]

INDICTMENT found and returned in the Superior Court Department on May 9, 2017.

 The case was tried before Richard J. Carey, J.

 Patricia A. DeJuneas for the defendant.

 Cynthia M. Von Flatern, Assistant District Attorney, for the Commonwealth.

 SULLIVAN, J. After a jury trial, the defendant, Christopher F. Hoime, was convicted of rape. See G. L. c. 265, § 22 (b). On appeal the defendant contends it was error to admit the testimony of a toxicologist regarding the symptoms of gamma hydroxybutyric acid (GHB) ingestion. He further contends that it was error to admit subsequent complaint evidence that corroborated the alleged victim's story and, he maintains, improperly bolstered her credibility. The defendant also claims impropriety in the prosecutor's closing argument. We conclude that the evidence

 Page 268 

 regarding the symptoms of GHB ingestion was properly admitted. We also conclude that the subsequent complaint evidence either had an independent basis for admission or did not prejudice the defendant, and that the closing argument was within appropriate bounds. Accordingly, we affirm the judgment.

 Background. We set forth the facts as presented to the jury, reserving additional details for discussion in the context of the issues raised. The defendant met a woman whom we shall refer to as Susan [Note 1] at a nightclub where she worked as a dancer. Her job duties included talking to customers and encouraging them to spend more money either by purchasing drinks or requesting onstage or lap dances. As a "good business move," she gave the defendant her cell phone number. The defendant and Susan texted and met at the nightclub from time to time.

 After declining several invitations, Susan agreed to go out with the defendant on July 31, 2014. [Note 2] The defendant and Susan met at a restaurant in Northampton, where they ate and Susan had two to three cucumber martinis over ice. Afterwards, the defendant drove his car to the Clarion Hotel in Northampton (hotel) and left the car there. [Note 3] While at the hotel, he checked in to room 157.

 The defendant and Susan next drove in her car to a second bar where she had two or three chocolate-flavored martinis. According to Susan, she had a "buzz going on" but was not "drunk." The defendant tried to kiss her. She rebuffed him and told him that he was old enough to be her father. She started to leave, but he apologized, and she stayed.

 The defendant purchased drinks for Susan throughout the night. Susan made sure to see that her drinks were prepared by the bartender at each location and that the bartender passed the drinks directly to her. [Note 4]

 Susan and the defendant went to a third bar. A glass of red wine in hand, Susan danced with the defendant and others. At some point the wine spilled on Susan, and she went to the rest room to

 Page 269 

 clean up. The defendant gave her another glass of red wine when she came out. Because she had not seen the drink when it was poured, she went back to the rest room and emptied it into the sink. When they went back downstairs, the defendant bought Susan another glass of red wine, which she saw the bartender pour. They walked around the bar and looked at a painting Susan liked. Soon after the second glass of red wine at the third bar, Susan felt as though she were in a "black tunnel" and could not clearly remember events thereafter.

 Susan then testified to a series of fragmented memories. At the end of the night, the defendant and Susan returned to the hotel. Susan had vague memories of being in her car, feeling panicked, and thinking something was wrong "because [she] hadn't really had that much to drink in the past hour" and she "knew that [she] shouldn't have been blacking out." She recalled she had no pants on in the hotel room. Susan attempted to leave but the defendant told her she could not go. She was unable to open the hotel room door; her "hand just wouldn't cooperate." Enraged, she broke the mirror on the wall.

 Susan next remembered waking up unable to move. Her arms were by her side, and she could not feel anything. The defendant told her not to move. She could hear the defendant slapping against her body and understood that he was penetrating her. The next morning, August 1, 2014, Susan woke up feeling confused and had difficulty walking. Her pants were on in an "awkward" manner, and the tampon she had used the day before was on the bedside table.

 She accused the defendant of rape, but he said he had been a "perfect gentleman." She left the room and walked with difficulty to her car. She attempted to return a call to an automobile finance company. Susan then called a close friend with whom she lived and told him she had been raped. This man became the first complaint witness. She also called two other male friends. [Note 5]

 On the evening of August 1, 2014, Susan went to a hospital, where she was seen by a sexual assault nurse examiner (SANE) nurse. She went because she believed she had been drugged and raped and wanted to have her blood tested for drugs. A sexual assault evidence kit (evidence kit) was completed, but Susan did

 Page 270 

 not report the incident to the police at that time. The evidence kit was turned over to the police, who retained it in an evidence refrigerator.

 Over the next few days, Susan texted the defendant to find out if he knew where her driver's license and debit card were. She also asked him for money to make her car payment and accused him of rape. She testified that he continued to text her after she told him to cease contact.

 Three months later, on November 10, 2014, Susan reported the sexual assault to the Northampton police. Police Sergeant Patrick Moody investigated. He ran the defendant's name through the registry of motor vehicles (RMV) database while interviewing Susan. He later obtained hotel records, cell phone records, and the broken mirror from the hotel. The evidence kit was sent to the State police crime laboratory (crime lab). Susan told police to suspend the investigation on November 11, 2014 because it was too "emotional" for her. Sergeant Moody suspended his investigation and returned the broken mirror to the hotel, which then disposed of it. The crime lab returned the untested evidence kit.

 In July of 2015, the Northampton police recontacted Susan, and the investigation was reopened. Sergeant Moody interviewed the first complaint witness, the man with whom Susan had been living on August 1, 2014. The samples collected from Susan on August 1, 2014 were re-sent to the crime lab for testing. Swabs of the external genitalia and anorectal swabs tested positive for sperm. Vaginal swabs tested negative. The defendant's known standard matched the sperm fractions with an occurrence of approximately one in 24.15 quintillion. [Note 6]

 A toxicologist testified that the urine and blood analysis was negative for GHB. She also testified to the manner in which GHB is metabolized and the physical symptoms of GHB ingestion. GHB is a central nervous system depressant. Effects are felt within fifteen to thirty minutes of ingestion, and may last from two to eight hours, depending on the dose. Symptoms include dizziness, nausea, loss of motor skills, confusion, sedation, and memory loss. In high doses, GHB can render a person unconscious. Alcohol may have an additive effect. GHB can pass through the system and become undetectable at some point less

 Page 271 

 than seventeen hours.

 Sergeant Moody and Sergeant Corey Robinson traveled to South Carolina to interview the defendant, accompanied by two local detectives. An audio recording of that interview was admitted in evidence. In that interview, the defendant initially denied knowing Susan, but as the questioning progressed, he acknowledged that he knew her but claimed he had only socialized with her in a group setting. At trial he said he had not recognized her picture and that he was nervous and intimidated by the presence of four police officers. For that reason, he was not initially forthright.

 The defense at trial was consent. The defendant testified that Susan was unimpaired, asked to return to the hotel room with him, took off her clothes, and engaged in consensual oral and vaginal sex. He denied anal intercourse. According to the defendant, Susan then stood on the bed and said she was a vampire, looked at the mirror on the wall, and hit the mirror, breaking it. She then bit him. He remained in the room and slept fitfully until the next morning.

 According to the defendant, Susan left without difficulty and asked him to help her make a car payment because she didn't have the money. Susan again asked for help making a car payment in the morning, and called or texted him throughout the day asking for money. He claimed that Susan was afraid that the man she lived with (the first complaint witness) would be angry with her for staying out all night, that she wanted money from the defendant, and that she contacted him for two to three weeks threatening to turn him in to police unless he helped her financially.

 Discussion. 1. Expert qualifications. The defendant posits that Kerrie Donovan, a toxicologist and Commonwealth witness, was not properly qualified as an expert in the fields of medicine and pharmacology and should not have been permitted to testify to the physical effects of GHB on the human body. We review the qualification of an expert for an abuse of discretion. Commonwealth v. Scesny, 472 Mass. 185, 195 (2015). "A trial judge has wide discretion to qualify an expert witness and to decide whether the witness's testimony should be admitted." Commonwealth v. Frangipane, 433 Mass. 527, 533 (2001). "In qualifying an expert witness, the question for judicial decision is whether the witness has sufficient skill, knowledge, and experience in the area of [her] training to aid a jury." Scesny, supra, quoting Commonwealth v. Mahoney, 406 Mass. 843, 852 (1990).

 Page 272 

 Toxicology is "[t]he branch of medicine that concerns poisons, their effects, their recognition, their antidotes, and generally the diagnosis and therapeutics of poisoning; the science of poisons," Black's Law Dictionary 1796 (11th 2019), or as Donovan testified, "the detection of presence of poisons or toxins in a person's system." Donovan had a bachelor of science degree in forensic science and was a supervisor, or "forensic scientist three," at the crime lab. She started working at the crime lab in 1999 in the criminalistics unit examining physical evidence, responding to crime scenes, and writing reports. In 2005, Donovan transferred to the toxicology unit, where she became a blood certified test analyst. She estimated that she had tested approximately 1,500 human samples for the presence of poisons or toxins, including GHB and alcohol. She also reviewed the literature regarding GHB. [Note 7]

 The judge determined that the testimony fell within the scope of Donovan's expertise as a forensic scientist. [Note 8] The judge had a reasonable basis to conclude that Donovan had adequate skill based on her education, training, and experience in forensic science to testify as an expert in the field of toxicology. See Scesny, 472 Mass. at 195 (experienced toxicologist with bachelor's degree in chemistry qualified as expert).

 2. Relevance and prejudice. The defendant filed a pretrial motion in limine objecting to testimony regarding the physical effects of GHB on the grounds that he was not charged with rape by drugging, see G. L. c. 272, § 3, and any suggestion that he had drugged Susan was speculative and prejudicial. "The judge's gatekeeping function in the context of expert testimony applies in addition to the judge's general duty to exclude evidence that is irrelevant or for which the probative value is substantially outweighed by the risk of unfair prejudice, confusion, or waste of time." Commonwealth v. Hoose, 467 Mass. 395, 417 (2014).

 Precisely because the defendant was not charged with rape by drugging, the Commonwealth was not required to show that the

 Page 273 

 defendant administered GHB to Susan, [Note 9] but the testimony regarding the effects of GHB was relevant to consent even if the source of the drug was unclear. [Note 10] The inability to consent may occur "as a result of the complainant's consumption of drugs, alcohol, or both." Commonwealth v. Blache, 450 Mass. 583, 590 (2008). The evidence regarding the effects of GHB and the speed with which it leaves the body was therefore relevant to explain to the jurors that Susan's symptoms were consistent with the ingestion of GHB. The expert testimony was also necessary to show that the negative test result did not rule out GHB ingestion. The jury were permitted to infer that someone put GHB in Susan's drink, based on her description of her symptoms and the expert testimony regarding the effect of GHB, and that she was tested too late to detect it.

 The testimony was relevant to consent and was not unduly prejudicial to the defendant. [Note 11] Any uncertainty regarding the source of the drug went to the weight, not admissibility, of the evidence. See generally Commonwealth v. Colon, 482 Mass. 162, 189 (2019) (defect in chain of custody goes to weight not admissibility); Commonwealth v. Thomas, 19 Mass. App. Ct. 1, 5 (1984), quoting Commonwealth v. Casale, 381 Mass. 167, 175 (1980) ("The fact that evidence does not exclude 'every other hypothesis' affects only its weight, not its sufficiency"); State v. Burns, 237 Ariz. 1, 17, cert. denied, 577 U.S. 846 (2015) ("That the GHB might have been naturally present went to the weight of the evidence rather than its admissibility"). [Note 12] The judge did not abuse his discretion in determining that the probative value of the GHB evidence outweighed any prejudice to the defendant. See Burns, supra ("the testimony that the GHB in [the murder 

 Page 274 

victim's] liver tissue could have naturally occurred or resulted from someone giving [her] a dose of the drug to subdue her was relevant to whether the sexual intercourse between [the defendant] and [the victim] was consensual").

 3. First complaint. Under the first complaint doctrine, "the recipient of a complainant's first complaint of an alleged sexual assault may testify about the fact of the first complaint and the circumstances surrounding the making of that first complaint. The witness may also testify about the details of the complaint." Commonwealth v. King, 445 Mass. 217, 218-219 (2005), cert. denied, 546 U.S. 1216 (2006). Other witnesses may not testify to subsequent complaints unless their testimony is independently admissible. See Commonwealth v. Santos, 465 Mass. 689, 700 (2013), quoting Commonwealth v. Arana, 453 Mass. 214, 220-221 (2009) ("The first complaint doctrine . . . does not 'prohibit the admissibility of evidence that, while barred by that doctrine, is otherwise independently admissible'"); Commonwealth v. Stuckich, 450 Mass. 449, 457 (2008). See also Mass. G. Evid. § 413(b) (2021).

 The defendant contends that the judge erred in admitting portions of the testimony of the SANE nurse and records of the SANE examination, as well as much of Sergeant Moody's testimony and his subsequent interview of Susan, because each statement constituted improper subsequent complaint evidence. A trial judge's ruling on the admissibility of such testimony is reviewed for abuse of discretion. See Commonwealth v. Aviles, 461 Mass. 60, 72-73 (2011). [Note 13] "When claiming an abuse of discretion, the defendant assumes a heavy burden . . . ." Commonwealth v. Hanino, 82 Mass. App. Ct. 489, 493 (2012). "If the judge was not given the opportunity to exercise discretion because the defendant failed to raise an objection, we review under the even more demanding substantial risk of a miscarriage of justice standard" (quotation and citation omitted). Id.

 a. SANE records and testimony. The defendant contends that it was error to admit testimony of, and medical records completed by, the SANE nurse without redacting statements regarding a description of the alleged perpetrator, how drinks were handed to

 Page 275 

 Susan, where the alleged assault occurred, and Susan's decision not to report the assault.

 The medical records were admitted pursuant to G. L. c. 233, § 79. The statute "makes admissible only those portions of records relating to treatment and medical history which possess the characteristics justifying the presumption of reliability" (quotation and citation omitted). Commonwealth v. Dargon, 457 Mass. 387, 396 (2010). A "record which relates directly and mainly to the treatment and medical history of the patient, should be admitted, even though incidentally the facts recorded may have some bearing on the question of liability" (quotation and citation omitted). Id. at 394.

 Susan's consumption of alcohol and the fact that the alleged perpetrator was a "male acquaintance" were relevant to medical treatment and therefore independently admissible. Those portions of the record (and accompanying testimony) informed how the SANE nurse conducted her examination, namely taking external, vaginal, and anorectal swabs, and performing a toxicology screen. See Dargon, 457 Mass. at 396, quoting Commonwealth v. DiMonte, 427 Mass. 233, 242 (1998) ("'fact-specific references to the reported cause of [h]er injuries' made for purposes of obtaining medical treatment . . . were . . . admissible even though 'incidental to liability'"). There was no error in admitting this much of the medical records and corresponding testimony as statements made for the purpose of obtaining medical treatment. Dargon, supra. See Commonwealth v. Michalski, 95 Mass. App. Ct. 520, 525 (2019) ("dual purpose served by the examination . . . does not alter the character of the medical history given . . . as statements made for purposes of diagnosis or treatment").

 The hotel name and room number were not relevant to medical treatment and should have been redacted. There was no objection to this evidence, however, and we review for substantial risk of miscarriage of justice. See Dargon, 457 Mass. at 397. There was no such risk. The evidence was cumulative of testimony offered by the hotel manager, and the defendant did not dispute that he and Susan spent the night in room 157 at the hotel. The evidence did not "materially influence" the verdict. Commonwealth v. McCoy, 456 Mass. 838, 850 (2010), quoting Commonwealth v. Randolph, 438 Mass. 290, 298 (2002).

 Susan's initial decision not to report the assault and her subsequent decision to go forward were necessary to explain the chain of custody of the evidence and the delay in testing. See 

 Page 276 

Commonwealth v. Espinal, 482 Mass. 190, 202 (2019) (fact of investigation had relevance in providing foundation for otherwise admissible evidence). Moreover, the Commonwealth was permitted to anticipate the defense of fabrication and to introduce this evidence on direct rather than redirect examination. See Aviles, 461 Mass. at 70; King, 445 Mass. at 241 (delaying some testimony until "the defendant has damaged the victim's credibility . . . can cause unwarranted prejudice to the Commonwealth").

 b. Investigation. Sergeant Moody testified to various details of his initial interview with Susan, in particular that he met Susan because she had come to the police state to "report a past sexual assault," and the date and place of the alleged assault. The defendant contends that Sergeant Moody's testimony about Susan's statements violated the first complaint doctrine. Similarly, he contends that Sergeant Moody's testimony regarding Susan's decision to stop the investigation the next day because it was too "emotional" for her, and her decision to resume it several months later, violated the first complaint doctrine. The defendant also challenges the admissibility of the evidence that Sergeant Moody checked the RMV records for the defendant, went to the hotel to obtain the room registration and the mirror, and matched the RMV record to the hotel registration.

 We agree that Sergeant Moody's testimony regarding Susan's report of "a past sexual assault," to which there was no objection, violated the first complaint rule. [Note 14] "The allowance of [the officer's] testimony of his interview with the victim -- even without substantive details -- is error under the first complaint doctrine, and unfairly enhances the victim's credibility" (footnote omitted). McCoy, 456 Mass. at 847. However, as previously noted, the evidence that Susan withdrew and reinstated her complaint, and what Sergeant Moody did with the evidence when she did, was independently admissible on the issue of chain of custody, and laid a foundation for the admission of physical evidence. See Espinal, 482 Mass. at 202. Her explanation that continuing the investigation was too "emotional" for her was relevant to the anticipated defense of fabrication. See Aviles, 461 Mass. at 70.

 Page 277 

 Sergeant Moody's testimony that he cross-referenced the RMV record and the hotel room registration was likewise admissible. [Note 15] The defendant claims that Sergeant Moody's testimony showed both what Susan told him and that he believed her. However, none of the testimony "enhanced her credibility by suggesting that the officer[] believed her. See McCoy, 456 Mass. at 851-852. The testimony simply described how different exhibits were obtained. . . . While the first complaint doctrine exists to prevent the appearance of buttressing a victim's allegations, here, the testimony by the investigating officer[] was not a 'piling on' of first complaint evidence. See id. at 845. Contrast Stuckich, 450 Mass. at 456-457." Commonwealth v. Kennedy, 478 Mass. 804, 815 (2018). Sergeant Moody's testimony regarding the recovery and return of the broken mirror was independently admissible to explain its absence at trial.

 We are left to discern whether the error in admitting Sergeant Moody's reference to Susan's report of "a past sexual assault" created a substantial risk of a miscarriage of justice. From the outset of the trial, in defense counsel's opening statement, the defendant argued fabrication. The defense theory was that Susan made up the story so that her boyfriend would not be angry with her for staying out all night, and went to the police (as the defense argued in closing) because she was "stuck" with the narrative. Given the nature of the defense, we are confident that the improper evidence had but very slight effect.

 c. Interview. In August 2016, Sergeant Moody traveled to South Carolina to interview the defendant along with Sergeant Corey Robinson. They were accompanied to the defendant's residence by two local police officers. The audio recording of the interview was played at trial.

 During the interview the defendant stated he did not recognize Susan from photographs the officers showed him. He didn't think he knew her and hadn't seen her. He did not recall going to the restaurant and the bars. He did not remember a broken mirror in his hotel room. Sergeant Moody then proceeded to detail Susan's report in a series of questions in which he repeated the chain of events leading from the dinner to the bars. The defendant initially continued to state that he did not remember Susan and did not know her. As the questioning progressed, he also said he may

 Page 278 

 have gone out with a group from the nightclub where she worked. Once Sergeant Moody repeated the rape allegation, the defendant said that he did not "remember this girl whatsoever," and that he did not remember going out with her alone. At trial, apprised of the deoxyribonucleic acid (DNA) evidence, the defendant acknowledged that he did know Susan and testified that the sex was consensual. The defendant did not object to the admission of the recording and, in closing argument, contextualized it as evidence of his level of confusion and intimidation.

 For the first time on appeal, the defendant contends that the repetition of the rape allegation itself constituted improper first complaint evidence and that the Commonwealth could have offered his denial that he knew Susan without the rape accusation. However, the recording of Sergeant Moody's questions "was not offered as first complaint testimony, but rather to provide context for the defendant's admissions." Commonwealth v. Kebreau, 454 Mass. 287, 300 (2009). The questions and answers in the interview as a whole were independently admissible as "equivocal responses that could be construed as self-incriminating and therefore admissible." Commonwealth v. Bonnett, 472 Mass. 827, 839 (2015), quoting Commonwealth v. Lewis, 465 Mass. 119, 127 (2013). See Commonwealth v. Morse, 468 Mass. 360, 375 n.20 (2014). To the extent that the defendant appeared to deny knowing Susan, these denials were initially accompanied with qualifying phrases such as "I don't know her I don't think" and "I don't know who she is" and lacked the unequivocal character which would have made them inadmissible. See Bonnett, supra at 838-839. Additionally (and critically), to the extent that the defendant admitted he was not honest with police, the defendant's response when confronted with the rape allegation was independently admissible to show consciousness of guilt. Id. at 839. [Note 16] See

 Page 279 

 generally Mass. G. Evid. § 801(d)(2)(A) (2021).

 4. Commonwealth's closing argument. The defendant contends he is entitled to a new trial because the prosecutor improperly argued the fact of Susan's subsequent complaints as substantive evidence to bolster Susan's credibility. The defendant raised no objection at trial; "therefore, we review to determine whether there was error, and, if so, whether the error created a substantial risk of a miscarriage of justice." Commonwealth v. Smith, 460 Mass. 385, 398 (2011).

 The prosecutor argued in closing that the defendant's testimony was inconsistent, his version of events "didn't make any sense," and suggested that, because he had lied previously to police, he was lying at trial. The prosecutor also argued that, in contrast, Susan's testimony was "credible," "consistent," and "corroborated." The defendant now contends that this argument invited the jury to consider subsequent complaint evidence for an improper purpose. See Commonwealth v. Niemic, 483 Mass. 571, 584-585 (2019).

 We are not persuaded. The prosecutor argued that Susan had no way to know that the hotel room mirror could still be located when she made her first trip to the police station four months after the events in question. The prosecutor also argued that the mirror corroborated Susan's story. We see no impropriety in these arguments, which referred to physical evidence, not subsequent complaints. The defendant also takes exception to the fact that the prosecutor challenged the plausibility of the defense theory that Susan "walk[ed] into the police station with a rape allegation" because the defendant had declined to make her car payment three months earlier. Had there been no defense of fabrication, the complaint to the police would be improper multiple complaint evidence. See Arana, 453 Mass. at 220-221; Mass. G. Evid. § 1113(b)(3) note (2021) ("A party may not use evidence for a purpose other than the limited purpose for which it was admitted"). In this case, however, the prosecutor's comments were a response to the defendant's theory, pursued throughout trial and argued by counsel in closing, challenging Susan's credibility and stating that she lied about the rape, and were therefore fair comments. See Espinal, 482 Mass. at 204-205 (testimony introduced to rebut claim of fabrication properly relied on in closing 

 Page 280 

argument). See generally Commonwealth v. Kozec, 399 Mass. 514, 519 n.9 (1987). Alternatively, to the extent there may have been error in the closing argument, there was no substantial risk of a miscarriage of justice based on the strength of the physical evidence. See note 16, supra.

Judgment affirmed.

FOOTNOTES
[Note 1] Because the woman's name is prohibited from disclosure by G. L. c. 265, § 24C, we refer to her by a pseudonym. 

[Note 2] Susan left her shift early that evening because the nightclub management would not allow her to drink. She testified that "for me to be able to function at that job the way I had to[,] I could not do it sober." 

[Note 3] The defendant had an ignition interlock device on his car. Once he left his car at the hotel he was free to drink, because he would not be driving it anymore that night. 

[Note 4] The defendant also testified that all the drinks were prepared by a bartender. 

[Note 5] Susan had texted with three men throughout the previous evening and early morning. These texts, their timing, and her memory of them was the subject of cross-examination and challenges to her credibility and the veracity of her claims. 

[Note 6] There was a second contributor on the external swab, but in an amount too small to make a comparison. There was no secondary contributor on the anorectal swab. Susan reported consensual sexual intercourse within the three days preceding the examination. 

[Note 7] The defendant challenges only the expert's qualifications, not the reliability of the research literature on GHB. Compare State v. Wakefield, 236 W. Va. 445, 458-459 (2015), cert. denied, 137 S. Ct. 33 (2016) (rejecting challenge to scientific validity of expert testimony regarding GHB). 

[Note 8] The trial judge initially allowed the defendant's motion in limine to exclude testimony regarding the effects of GHB, but allowed the Commonwealth's motion to reconsider. 

[Note 9] Cf. State v. Tozier, 136 Conn. App. 731, 737-741 (2012) (in trial for rape by mental incapacitation, prosecution need not prove exactly which drug was administered). 

[Note 10] The crime of rape is proven where the accused "has sexual intercourse . . . with a person and compels such person to submit by force and against [her] will." G. L. c. 265, § 22 (b). 

[Note 11] In her closing argument, the prosecutor specifically disclaimed any obligation to prove that the defendant drugged Susan and did not claim that the defendant had done so. 

[Note 12] Moreover, the jury also heard testimony that Susan had several drinks throughout the night. The jury were permitted to find that she had been unable to consent due to incapacitation by either alcohol or GHB, or both. In any event, the Commonwealth was entitled to show that GHB was a possible source of her incapacitation, particularly in view of her testimony that she was able to drink large amounts of alcohol without significant effect. 

[Note 13] "[A] judge's discretionary decision constitutes an abuse of discretion where we conclude the judge made 'a clear error of judgment in weighing' the factors relevant to the decision, such that the decision falls outside the range of reasonable alternatives" (citation omitted). L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014). 

[Note 14] In addition, Sergeant Moody testified that he ran the RMV check while he was speaking with Susan. We think the defendant is correct that this testimony would permit a jury to infer that Susan gave Sergeant Moody the defendant's name. However, there is nothing in the testimony to suggest that Sergeant Moody did anything other than investigate her claim, and given that consent and not identity was the defense, we do not think this testimony created a substantial risk of a miscarriage of justice for the reasons stated infra. 

[Note 15] The hotel manager who originally provided Sergeant Moody with the copies of the hotel records also testified at trial. 

[Note 16] We do not suggest that any and all repetition of a sexual assault victim's allegations during the course of a police interview of a defendant is categorically admissible when the responses are equivocal. In this case, the questioning was not gratuitously repetitive and did not rise to the level of "piling on" disapproved in the cases. See McCoy, 456 Mass. at 845. More importantly, as previously noted, the evidence was independently admissible for a separate reason -- to show consciousness of guilt. And even if some portion of the recording should have or could have been redacted, we discern no substantial risk of a miscarriage of justice, based on the strength of the physical evidence. See Dargon, 457 Mass. at 398. The defendant's own testimony provided no explanation for the presence of his DNA in Susan's rectum, an omission highly damaging to the consent defense. To the extent that there may have been error, we do not think it made "a difference in the jury's conclusions." Commonwealth v. Taylor, 455 Mass. 372, 384 (2009), quoting Commonwealth v. Kater, 432 Mass. 404, 422-423 (2000). 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.